## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

GADSDEN INDUSTRIAL PARK, LLC,   )
                                     )
      Plaintiff,                )
                                     )
v.                                 ) Case No. 4:15-cv-0956-JEO
                                     )
UNITED STATES OF AMERICA; CMC,   )
INC.; and HARSCO COPORATION,    )
                                   )
      Defendants.            )

## <u>MEMORANDUM OPINION</u>

In this action, Plaintiff Gadsden Industrial Park, LLC ("GIP") has sued the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq., and two government contractors, CMC, Inc. ("CMC") and Harsco Corporation ("Harsco") (hereinafter collectively "Defendants") under Alabama tort law.  (Doc.[1] 27, Amended Complaint (hereinafter "Complaint" or "Compl.")). The cause comes to be heard on two pending motions.  The first is a joint motion filed by CMC and Harsco (collectively the "Contractors") in which they seek a dismissal or, in the alternative, a stay of the proceedings on the claims against

---

[1] References to "Doc(s). ___" are to document number(s) of the pleadings, motions, and other materials in the court file, as compiled and designated on the docket sheet by the clerk of the court.  Unless otherwise noted, pinpoint citations are to the page of the electronically filed document on the court's CM/ECF system, which may not correspond to pagination on the original "hard copy" presented for filing.

them, based on an argument that GIP has engaged in improper claim-splitting.

(Doc. 36 (incorporating Docs. 7 & 8)).  In the other pending motion, the United

States seeks a dismissal for lack of jurisdiction, based on the discretionary-

function exception to the FTCA's waiver of sovereign immunity.  (Doc. 37). The

parties have exhaustively briefed the motions.  (Docs. 45-47, 48-1, 50, 51, 54-55,

59, 61).  Upon consideration, the court[2] concludes that both motions to dismiss are

due to be granted.

## I.

## A.

The salient allegations of the Complaint are these:  Prior to the events

giving rise to this lawsuit, a company known as Gulf States Steel, Inc. of Alabama

("Gulf States") owned and operated a 761-acre steel manufacturing facility in

Gadsden, Alabama (the "Site").  (Compl. ¶ 11).  In 1999, Gulf States filed for

bankruptcy, and, in connection with that proceeding, various of its assets were

sold off.  (*Id.*)  One such asset was a railroad track system installed on the Site,

which was purchased in 2001 by the Williams Family Limited Partnership

("Williams").  (*Id.* ¶ 13).  In 2002, Plaintiff GIP purchased other Gulf States

---

[2]The parties have consented to an exercise of plenary jurisdiction by a magistrate judge
pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  (Doc. 29).

assets, including about 434 acres of the Site real estate.  (*Id.* ¶ 14).  GIP also purchased other assets situated on an approximately 200-acre portion of the Site that GIP did not buy, an area of land the Complaint refers to as the "Excluded Real Property."  (*Id.* ¶¶ 15, 16).  In particular, GIP purchased all of the "kish" as well as 420,000 cubic yards of "slag" located on the Excluded Real Property.  (Compl. ¶ 16).  Kish is a by-product of the steelmaking process and contains recyclable metal particulates, while slag is the unrefined result of the first step of the steelmaking process.  (*Id.* ¶ 17).  Both had been "dumped and/or stockpiled" at various locations on the Excluded Real Property during the approximately 97-year period that Gulf States and its predecessors used the Site for metal manufacturing.  (*Id.*)

After GIP's purchase, it partnered with Williams to operate a railroad car storage business on the Site, using the tracks that Williams had bought.  (*Id.* ¶ 18). That partnership later dissolved, and Williams sold the entire track system to GIP in 2005.  (*Id.* ¶ 19).  After refurbishing parts of the system and purchasing locomotives, GIP commenced running its own railroad car storage business on the Site in January 2008.  (Compl. ¶ 21).

In 2007 or 2008, however, the United States Environmental Protection Agency ("EPA") began remedial work on the Excluded Real Property as part of a "Superfund" site project under the Comprehensive Environmental Response,

Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9657 (*Id.* ¶ 23). In undertaking that operation, the EPA barred GIP from entering the Excluded Real Property, thereby preventing it from using any of the rail spur lines located thereupon. (*Id.* ¶ 24). Further, although GIP says that it "had been making preparations" to retrieve and sell its kish on the Excluded Real Property (*id.* ¶ 31), the EPA's denial of access also prevented GIP from carrying out such plans. (*Id.* ¶¶ 24, 31, 36).

In about 2007, the EPA hired Defendant CMC to be its "emergency response contractor and/or site manager at the Site." (Compl. ¶ 25). In about 2008, the EPA, by and through CMC, hired Defendant Harsco to conduct a pilot study of the materials located on an eight-acre portion of a "non-hazardous permitted landfill situated on the Excluded Real Property, for the sole purpose of determining whether and to what extent those materials contained valuable metal-bearing items that could be marketed and resold for profit." (*Id.* ¶ 26). After that study concluded that mining portions of the Excluded Real Property for recyclable metals would be profitable, the EPA, again acting by and through CMC, hired Harsco in October 2009 to conduct a full-scale "slag processing" operation, pursuant to which Harsco agreed to mine the eight-acre portion of the Excluded Real Property for the purpose of extracting and selling valuable metal-bearing

materials. (*Id.* ¶¶ 28, 29). In return, Harsco would remit a percentage of the gross proceeds from such sales to CMC, which, in turn, would credit the EPA for amounts it otherwise owed on the project to CMC. (*Id.*) Pursuant to that agreement, from early 2010 through sometime in 2013, Harsco proceeded to mine, process, market, and sell to third parties "many, many millions of dollars" worth of metal-bearing materials from the kish and slag that GIP had purchased out of the Gulf States bankruptcy. (*Id.* ¶¶ 30, 32, 33, 34). Harsco did not, however, limit those efforts to the eight-acre portion of the parcel originally agreed upon, nor only the non-hazardous permitted landfill portions of the Excluded Real Property. (Compl. ¶ 33). Rather, GIP maintains, with the knowledge and approval of the EPA and CMC, Harsco mined the Excluded Real Property wherever it determined metallic items of value existed. (*Id.* ¶ 34). And despite the fact that Defendants were at all times aware of GIP's claimed interest in the kish and slag, they continued to prohibit GIP from itself retrieving and selling them. (*Id.* ¶¶ 32, 35, 36).

In addition, GIP alleges that "during the course of its work mining for 'kish,' [the Contractors,] with the EPA's knowledge and approval, also uninstalled, cut, severed, tore up from the ground, and removed roughly 1,400 feet of track [on the HS-1 and HS-2 spur lines] owned by [GIP] on the [Excluded Real

Property, along with all accompanying ties, plates, spikes, and the like." (*Id.* ¶ 37). Defendants then discarded those materials "and/or" sold them to third parties. (*Id.* ¶ 38). Similarly, GIP claims that the EPA, by and through the Contractors or other employees or agents, "completely covered" another 1,000 feet of track on the HN-1 spur line owned by GIP on the Excluded Real Property with "non-saleable mined material," thereby rendering those tracks unusable. (Compl. ¶ 39). GIP ultimately insists that "no condition existed at the Site which would have authorized, necessitated or required the Defendants under CERCLA to have removed [GIP]'s property, ... to have covered or discarded [GIP's] property and/or to have conveyed it to third parties." (*Id.* ¶ 42). Despite numerous demands by GIP, neither the EPA nor the Contractors have remitted any compensation to GIP for the destruction or removal of its property at the Site. (*Id.* ¶ 43; *see also* Docs. 27-1, 27-2, 27-3).

GIP filed this action on June 5, 2015. (Doc. 1). In its now-governing amended pleading filed in August 2015, GIP brings claims under the FTCA and Alabama tort law against Defendants, set forth in four counts. (Doc. 27, Compl.). Count I alleges that all three Defendants are liable for conversion of GIP's kish and slag located on the Excluded Real Property, while Count II similarly alleges that those Defendants acted negligently by "removing, destroying, discarding

and/or selling" same. Counts III and IV assert that the United States, but not either of the Contractors, is also liable for conversion and negligence, respectively, based upon the removal and burial of the aforementioned sections of railroad track on the Excluded Real Property.

In support of its pending motion to dismiss, the United States has filed an affidavit sworn by Terrence Byrd, an "On-Scene Coordinator" in the EPA's "Superfund Division." (Doc. 37-2 ("Bryd Aff.") ¶¶ 1, 3). In his affidavit, Byrd recites the following: The EPA designated the Gulf States Site as a Superfund removal site in 2001 when it initiated an investigation there and that associated removal operations began in 2003 and concluded in 2013. (Byrd Aff. ¶ 5). The site had "two large waste piles" that "contained certain hazardous substances that were leaching into the ground, nearby water sources, and the sediments of Black Creek and Lake Gadsden." (*Id.* ¶ 6). In response, the "EPA sought a way to remove the hazardous substances and decrease the volume of the waste piles to lessen the environmental impact." (*Id.*)

Byrd's affidavit also contains a number of allegations that confirm or are otherwise generally consistent with those GIP pleads in its Complaint. According to Byrd, CMC, as the project manager hired by the EPA, offered several options for proceeding, including by "recycling the metallic content of the waste piles."

7

(*Id.* ¶ 7). CMC then hired Harsco to conduct a pilot study, based upon which "Harsco determined that the waste material would yield sufficient metal content to make processing the material from an engineering and economic standpoint." (*Id.* ¶ 9). That study, Byrd says, "also demonstrated to EPA that removal of the metallics would reduce the volume, toxicity, and mobility of the hazardous substances in the waste piles and was more cost effective that the other removal alternatives considered." (Byrd Aff. ¶ 10). Harsco then entered into a subcontract with CMC, under which the former would conduct the removal operation, extract metallic content from the waste piles, sell it, and pay CMC a royalty that would be credited against amounts the EPA owed to CMC on the project. (*Id.* ¶ 11).

Finally, Byrd's affidavit makes a number of claims related to the scope of the EPA's alleged supervision and oversight of the Contractors' removal operation. For example, he states that the "EPA directed CMC who in turn directed Harsco when and where to mine within the two waste piles," while Harsco was responsible for determining more specifically what recyclable metallics were present and whether to remove them and for finding a buyer for extracted materials at market price. (*Id.* ¶ 13). Byrd also states that, throughout the removal operation, an EPA representative "was on-site or in contact" (*id.* ¶ 14) and "was consulted ... whenever Harsco encountered something in the waste piles

unusual or out of the ordinary, such as its discovery of rail track HN-1 in the North Waste Pile and rail tracks HS-1 and HS-2 in the South Waste Pile." (*Id.* ¶ 15). Byrd maintains that those "spur lines were cut and removed or buried at the specific direction of the EPA, through its contractor CMC, because the spur lines interfered with the progress of the removal operation and the construction of the cap." (Byrd Aff. ¶ 16).

## B.

GIP, the United States, CMC and Harsco have also been involved in no less than four prior lawsuits related to the EPA cleanup at the Site. The first two of those actions were filed by GIP in the United States Court of Federal Claims, asserting in each that the United States is liable for having taken GIP's property without just compensation, in violation of the Fifth Amendment. The first such action, filed in November 2010, was based on allegations that the United States and its contractor, then otherwise unidentified, had prevented GIP from accessing its kish on the Excluded Real Property and had been themselves removing the kish and selling it to offset expenses of the EPA cleanup at the Site. *Gadsden Indust. Park, LLC v. United States*, 1:10-cv-757-EGB (the "2010 Claims Case"), Complaint (Fed. Cl. Nov. 3, 2010); (Doc. 7-7). In March 2016, the Court of Federal Claims denied the United States' motion for summary judgment. (2010

Claims Case Docs. 110, 129).  Thereafter, that court held a bifurcated trial, which

concluded in late July 2017.  (2010 Claims Case Docs. 169, 171, 173, 175, 178,

180, 182).  Post-trial briefing is expected to be complete in by early January 2018.

(2010 Claims Case Doc. 184).  As such, no final judgment has been entered.

GIP filed its second action in the Court of Federal Claims in November

2013.  *Gadsden Indust. Park, LLC v. United States*, 1:13-cv-924-EGB ("2013

Claims Case"), Compl. (Fed. Cl. Nov. 22, 2013); (Doc. 7-6).  There GIP raised a

Fifth Amendment takings claim based on allegations that "the EPA, by and

through its employees, servants, agents, and/or contractors," had removed,

destroyed, and/or buried the two aforementioned sections of spur line railroad

track on the Excluded Real Property.  (*Id.*; *see also* Doc. 7-4, Amended Complaint

in the 2013 Claims Case).  In January 2017, the United States filed a motion for

summary judgment, which GIP did not contest.  (*See* 2013 Claims Case Docs. 92,

94, 110).  Accordingly, on March 31, 2017, the court granted summary judgment

to the United States on GIP's claim.[3]  (2013 Claims Case Docs. 94, 110).  On

---

[3]As further discussed in the text below, in granting summary judgment to the United States in the 2013 Claims Case, the Court of Federal Claims held that GIP was collaterally estopped from claiming that it owned the railroad tracks at issue as required to establish its takings claim, based upon a final judgment that this court entered in August 2016 against GIP in a separate tort action.

August 21, 2017, the court entered a final judgment in the case.[4] (*See* 2013 Claims Case Doc. 111).

The third and fourth prior actions related to the EPA cleanup at the Site were both filed in this court. First, in January 2014, GIP filed a tort action against the same three Defendants sued in this case, *i.e.*, the United States, CMC, and Harsco. *See Gadsden Indus. Park, LLC v. United States*, No. 4:14-CV-0039-KOB (the "2014 Tort Case"), Doc. 1, Complaint (N.D. Ala. Jan. 8, 2014); (Doc. 8-1 at 3-12). As here, GIP sought in the 2014 Tort Action to recover under the FTCA and Alabama tort law, asserting claims for conversion and negligence based, as in the 2013 Claims Case, on allegations that, "in or around the summer of 2012," Defendants had removed and buried the sections of railroad track on the Excluded Real Property. (2014 Tort Case Doc. 1, ¶¶ 19-21). Unlike in the case *sub judice*, however, GIP's complaint in the 2014 Tort Action did not reference efforts by Defendants to mine and sell the kish and slag.

On June 26, 2015, this court dismissed the United States from the 2014

---

[4]Although the Court of Federal Claims had granted summary judgment in favor of the United States on GIP's takings claim, the court delayed entering a final judgment in the 2013 Claims Case because the United States had asserted a fraud counterclaim against GIP that remained pending. (See 2013 Claims Case Doc. 110). In June 2017, that court held a trial on the government's counterclaim, at the conclusion of which the court stated that would be finding for GIP. (*Id.* at 2). On August 21, 2017, the court then formally entered a final judgment denying relief as to all claims and counterclaims. (2013 Claims Case Doc. 111).

Tort Case on the ground that GIP had failed to exhaust administrative remedies as required by 28 U.S.C. § 2675(a). (2014 Tort Case Docs. 36, 37; Docs. 7-8, 7-9). By contrast, the court denied the Contractors' joint motion to dismiss, as well as a later one for summary judgment. *See Gadsden Indust. Park, LLC v. United States*, 111 F. Supp. 3d 1218 (N.D. Ala. 2015). And while GIP did not formally assert a claim in the 2014 Tort Action based upon the removal of the kish from the slag piles on the Excluded Real Property, the court's opinion denying summary judgment on GIP's claims for the removal and burial of the spur line tracks nevertheless discussed at some length the Contractors' mining of the slag piles. *See id.*, at 1224-26, 1229-32.

Following the denial of summary judgment in the 2014 Tort Case, GIP abandoned its negligence claims and elected to proceed at trial against the Contractors on its conversion theory only. (2014 Tort Case Doc. 139). At the close of GIP's case, the court granted the Contractors' joint motion for judgment as a matter of law, holding that no liability could lie under Alabama law for conversion of the railroad tracks because they were a fixture to real property that GIP did not own. (2014 Tort Case Doc. 152); *Gadsden Indust. Park, LLC v. CMC, Inc.*, 2016 WL 4158138 (N.D. Ala. Aug. 5, 2016). The court entered a final judgment accordingly on August 5, 2016. (2014 Tort Case Doc. 153). After the

12

time to appeal expired, the United States used that judgment to obtain its summary judgment in the then-still-pending 2013 Claims Case, successfully arguing that GIP was collaterally estopped from asserting that it owned the railroad tracks, as required to establish its associated Fifth Amendment takings claim. (*See* 2013 Claims Case Docs. 92, 94).

Meanwhile, in May 2014, the United States filed the fourth and final prior related lawsuit, suing GIP in this court under CERCLA. *See United States v. Gadsden Indus. Park, LLC*, No. 4:14-cv-0992-KOB (the "CERCLA Case"), Doc. 1 (N.D. Ala. May 27, 2014). There, the United States sought to recoup costs incurred by the EPA in responding to the release and threatened release of hazardous substances from the slag piles owned by GIP. (*Id.*) That claim relied on CERCLA § 107(a), 42 U.S.C. § 9607(a), under which certain enumerated potentially responsible parties ("PRPs") may be liable to reimburse the government for amounts expended in performing an environmental clean up.[5] *See*

---

[5]CERCLA § 107 provides in relevant part as follows:

**(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date**

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section--

(1) the owner and operator of a vessel or a facility,

*Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 608-09 (2009);

*Cooper Indust., Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 161 (2004).  For the

basis of its claim, the United States alleged that GIP was a PRP as the "owner" or

"operator" of a "facility" under CERCLA § 107(a)(1), based upon GIP's

ownership of the slag piles.  On April 1, 2015, however, this court granted GIP's

motion to dismiss, holding that the slag piles themselves were not a "facility" as

---

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for--

    (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

    (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

    (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

    (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a).

defined by CERCLA, so GIP's ownership of them was insufficient to make it a PRP. (CERCLA Case Docs. 34, 35); *United States v. Gadsden Indust. Park, LLC*, 2015 WL 1499203 (N.D. Ala. Apr. 1, 2015); (*see also* CERCLA Case Docs. 22, 31); *United States v. Gadsden Indust. Park, LLC*, 2015 WL 1499142 (N.D. Ala. Feb. 11, 2015); *id.,* 2015 WL 1499156, at *1 (N.D. Ala. Mar. 19, 2015). There was no appeal.

## C.

All three Defendants in the instant action have moved to dismiss. First, the Contractors have filed a joint motion to dismiss citing FED. R. CIV. P. 12(b)(6), or, in the alternative, to stay the proceedings as to the claims against them pending the resolution of the 2010 Claims Case and the 2014 Tort Case. (*See* Docs. 7, 8, & 36). In support, the Contractors argue that GIP's claims against them are part of the same cause of action underlying the 2014 Tort Case. (Doc. 7 at 1). As such, the Contractors assert, GIP is guilty of "improper claim-splitting" and of violating FED. R. CIV. P. 15(a)(2) and FED. R. CIV. P. 16(b). (*Id.*) For its part, GIP denies that it has split its claim or violated either of the FEDERAL RULES cited by the Contractors.

The United States also moves for a dismissal, for lack of subject-matter jurisdiction under FED. R. CIV. P. 12(b)(1). (Doc. 37). The United States argues

that GIP's claims against it are barred under 28 U.S.C. § 2680(a), which imposes a discretionary-function exception to FTCA liability. (*See id.*; Doc. 37-1). In support, the United States has also submitted Byrd's previously-described affidavit.

In opposing that motion, GIP first argues that the United States is collaterally estopped from asserting that it is shielded by the discretionary-function exception. (Doc. 46 at 1-2, 6-9). That is so, GIP asserts, based on this court's determination in the CERCLA Action that the United States is not entitled to reimbursement for its response costs from GIP under CERCLA § 107(a). (*Id.*) Alternatively, GIP contends that, irrespective of collateral estoppel, the discretionary-function exception does not apply to the United States' conduct, which GIP characterizes as "knowing theft of [GIP's] property for purely profiteering motive." (*Id.* at 9-13). Finally, GIP maintains that even if the discretionary function exception might apply, it would be premature to dismiss the action on that basis without affording GIP an opportunity to conduct discovery to counter allegations in Byrd's affidavit. (*Id.* at 13-19).

## II.

FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1) authorizes a motion to dismiss a complaint for "lack of subject-matter jurisdiction." Such jurisdictional

16

attacks come in two separate forms - a "facial" challenge or a "factual" challenge.

The Eleventh Circuit has summarized:

> "Facial attacks" on the complaint "require[ ] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.), *cert. denied*, 449 U.S. 953 (1980) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "Factual attacks," on the other hand, challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.*

*Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). When the attack is factual, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* at 1529 (quoting *Williamson v. Tucker*, 645 F.2d 404, 412-13 (5th Cir. 1981)).

FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6), FED. R. CIV. P., authorizes a motion to dismiss a complaint on the ground that its allegations fail to state a claim upon which relief can be granted. On such a motion, the "'issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Little v. City of North Miami*, 805 F.2d 962, 965 (11th Cir. 1986) (quoting *Scheur v. Rhodes*, 416 U.S. 232, 236 (1974)).

The court assumes the factual allegations in the complaint are true and gives the plaintiff the benefit of all reasonable factual inferences. *Hazewood v. Foundation Fin. Group, LLC*, 551 F.3d 1223, 1224 (11th Cir. 2008) (per curiam).

Rule 12(b)(6) is read in light of Rule 8(a)(2), FED. R. CIV. P., which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations, brackets, and internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level ...." *Id.* Thus, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *i.e.*, its "factual content ... allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

# III.

## A.

The court first considers the Contractors' motion, which asks for a dismissal or, in the alternative, a stay of these proceedings pending the resolution of the 2010 Claims Case and the 2014 Tort Case. (Doc. 36). In support, the Contractors argue that GIP has engaged in "improper claim-splitting." (Doc. 8 at 1). More particularly, they maintain that GIP's claims against them, which are based on the removal of kish and slag from the Excluded Real Property, are part of the same cause of action underlying the 2014 Tort Case, in which GIP sought to recover based upon the removal and burial of the sections of the spur line tracks, also on the Excluded Real Property. The Contractors concede that, in the 2014 Tort Case, GIP did not plead a right to recover based on the removal of the kish and slag. (*See id.* at 13 (observing that the 2014 Tort Case differs from the present action insofar as GIP has "added 'kish' and 'slag' to the property allegedly taken by the Defendants"). Nevertheless, the Contractors maintain that such claims made here are barred under the claim-splitting doctrine because GIP's claims in both cases are, the Contractors say, "based on the same set of operative facts--that [the United States], CMC, and Harsco tortiously converted private property and negligently exceeded their powers and authority while performing [an] EPA[-] directed

19

cleanup of the Site." (*Id.* at 6 (internal quotation marks and citation omitted)).

GIP does not contest that the federal courts recognize a rule against claim-splitting. Rather, GIP argues that it has not, in fact, split its claim against the Contractors. That is, GIP insists that its conversion and negligence claims against the Contractors in this action, based on the removal of the kish and slag, are "entirely distinct and independent from GIP's prior claims relating to [the] conversion of GIP's railroad track." (Doc. 45 at 8).

In *Vanover v. NCO Financial Services, Inc.*, 857 F.3d 833 (11th Cir. 2017), the Eleventh Circuit recently addressed, as an issue of first impression, the rule against claim-splitting, which "requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit." *Id.* at 841 (quoting *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011). In other words, "a plaintiff may not split up his demand and prosecute it by piecemeal, or present only a portion of the grounds upon which relief is sought, and leave the rest to be presented in a second suit, if the first fails." *Id.* (internal quotation marks and citation omitted). The claim-splitting doctrine thus ensures fairness to litigants, conserves scarce judicial resources, and promotes the efficient and comprehensive disposition of cases. *Id.*

The court further recognized in *Vanover* that the claim-splitting doctrine

derives from, and is analyzed as an aspect of *res judicata* known as claim

preclusion. 857 F.3d at 836 n. 1, 841-42. So like *res judicata*, the claim-splitting

doctrine may be raised by way of a Rule 12(b)(6) motion to dismiss. *Id.* at 836 n.

1. However, the Eleventh Circuit explained, whereas *res judicata* might apply

only after the first suit has reached a final judgment, the claim-splitting doctrine

applies where a second suit has been filed but no final judgment has yet been

reached. *Id.* at 840 n. 3, 841. Nevertheless, *Vanover* held that the test for

determining whether the rule against claim-splitting applies effectively

incorporates the other requirements of *res judicata* by asking "whether the first

suit, assuming it were final, would preclude the second suit." *Id.* at 841 (quoting

*Katz*, 655 F.3d at 1218). That is, the Eleventh Circuit recognized, a court is to

examine whether both cases (1) "involve[ ] the same parties [or] their privies" and

(2) "arise from the same transaction or series of transactions." *Id.* at 841-42.

"Successive causes of action arise from the same transaction or series of

transactions when the two actions are based on the same nucleus of operative

facts." *Id.* at 842 (citing *Petro-Hunt, LLC v. United States*, 365 F.3d 385, 395-96

(5th Cir. 2004)).

At the outset, the court observes that when the Contractors filed their

motion to dismiss, the 2014 Tort Case was, of course, still pending. So with no

final judgment in that case, *res judicata* could not have itself applied to GIP's claims in this action. Therefore, the Contractors' motion correctly invoked the related rule against claim-splitting. Since then, however, Judge Bowdre has entered a final judgment on the merits of GIP's claims in the 2014 Tort Case, ruling in favor of the Contractors. As such, it makes little sense for this court to ask whether this suit "would be" precluded as *res judicata* by the 2014 Tort Case, "assuming it were final," as the court would do in a claim-spitting inquiry under *Vanover*. Rather, since the 2014 Tort Case is, in fact, final, it is more appropriate, from a procedural perspective, simply to ask whether GIP's claims in this action against the Contractors are barred by *res judicata itself*.[6]

Nor will such a shift in the analysis prejudice the parties. Federal law governs the scope of *res judicata* arising from a prior federal court judgment. *Empire Fire & Marine Ins. Co. v. J. Transport, Inc.*, 880 F.2d 1291, 1293 n. 2 (11th Cir. 1989). To that end, *res judicata*, or claim preclusion, requires the following four elements to be satisfied: "(1) there must be a final judgment on the merits, (2) the decision must be rendered by a court of competent jurisdiction, (3) the parties, or those in privity with them, must be identical in both suits; and (4)

---

[6]That the 2014 Tort Case is now final also moots the Contractors' motion to the extent that it alternatively requests a stay pending the resolution of that litigation.

the same cause of action must be involved both cases." *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501 (11th Cir. 1990) (quoting *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir. 1986)).  The first three elements are unquestionably met here.  That is, the 2014 Tort Case resulted in a final judgment on the merits, entered by a court of competent jurisdiction, and it involved the same parties.  The only disputed issue is whether this action and the 2014 Tort Case involve the "same cause of action."  And on that score, *Vanover* makes clear that such requirement of *res judicata* is incorporated into the test for determining whether to apply the rule against claim-splitting, *see* 857 F.3d at 841-42, and the parties have unambiguously framed their claim-splitting arguments in recognition of that principle.  (*See* Doc. 8 at 11-15; Doc. 45 at 7, 9-15).  Therefore, the court will consider whether GIP's claims against the Contractors are *res judicata* in light of the judgment in the 2014 Tort Case.

Again, GIP did not claim in the 2014 Tort Case that the Contractors were guilty of negligence or conversion based on their removal and sale of kish and slag.  Rather, GIP there claimed only that the Contractors were guilty of negligence and conversion based upon their having removed and buried the sections of spur line track.  Nevertheless, *res judicata* precludes litigation not only of claims and theories actually raised in a prior suit but also of those that are

23

sufficiently related that they are deemed part of the same "cause of action." *See Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1187 (11th Cir. 2003). To determine whether a case asserts the same cause of action as one previously litigated to a judgment, the Eleventh Circuit has adopted the so-called "transactional" approach, as generally expressed in § 24 of the Restatement (Second) of Judgments (1982). *See Baloco v. Drummond Co.*, 767 F.3d 1229, 1247 (11th Cir. 2014); *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1270 (11th Cir. 2002); *Ragsdale v. Rubbermaid, Inc.*,193 F.3d at 1235,1239 & n. 8, 1240 (11th Cir. 1999); *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1551 (11th Cir. 1990); *see also United States v. Tohono O'Odham Nation*, 563 U.S. 307, 316 (2011); 18 C. Wright, A. Miller, et al., *Fed. Prac. & Proc.* § 4407 (3d ed.) (discussing the federal courts' adoption of the Second Restatements's transactional approach). Under that analysis, a prior judgment extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) of Judgments § 24(1) (1982); *see also In re FFS Data, Inc.*, 776 F.3d 1299, 1307 (11th Cir. 2015); *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1270 (11th Cir. 2002). The Eleventh Circuit has further explicated the inquiry as follows:

Just what factual grouping constitutes a "transaction" or what factual groupings constitute a "series," are "to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." [Restatement (Second) of Judgments § 24(2) (1980)].

As the commentary to § 24(2) illustrates, one must apply a pragmatic standard:

> The expression "transaction, or series of connected transactions," is not capable of a mathematically precise definition; it invokes a pragmatic standard to be applied with attention to the facts of the cases. And underlying the standard is the need to strike a delicate balance between, on the one hand, the interests of the defendant and of the courts in bringing litigation to a close and, on the other, the interest of the plaintiff in the vindication of a just claim.

* * *

> In general, the expression connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held precluded. But the opposite does not hold true; even when there is not a substantial overlap, the second action may be precluded

if it stems from the same transaction or series.

Restatement (Second) of Judgments § 24(2) cmt. b (1980).

*Ragsdale*, 193 F.3d at 1239 n. 8.

The court concludes that GIP's claims in the 2014 Tort Action and its claims against the Contractors here all arise from either the same transaction or at least a series of connected transactions and are thus part of the same "cause of action" for purposes of *res judicata*. In both cases, GIP claims the Contractors are liable under the same two Alabama tort law theories, *i.e.*, conversion and negligence, for infringing upon GIP's right to use and enjoy its personal property located on the Excluded Real Property. To be sure, each case involves a different kind of property, with the prior case revolving around the removal of and damage to the spur line tracks while this case is founded upon the removal and sale of kish and slag. Even so, when GIP filed the 2014 Tort Action, it was undisputedly aware of the claimed infringement of its rights in both kinds of property. Moreover, not only has GIP in this action joined claims alleging tortious interference with its property rights as it relates to the kish and slag and to the railroad tracks,[7] no one has thought that the slightest bit strange. That is so

---

[7]Of course, GIP seeks in the present action to recover for harm to both kids of property only from the United States under the FTCA. GIP's claims here against the Contractors are limited to their removal and sale of the kish and slag, whereas GIP made (and eventually lost) its

because those claims all have a strong and obvious nexus: all of GIP's purported misconduct is alleged to have occurred in the course of work the Contractors performed under the auspices of the EPA's ongoing environmental response at the Site pursuant to CERCLA. That is, GIP has claimed in the two cases that, following the commencement of the CERCLA recovery action, Defendants prohibited GIP from entering upon the premises of the Excluded Real Property, thereby cutting off GIP's access to all of its personal property located thereupon, and that Defendants then proceeded to remove, damage, destroy, and sell off that personal property.

As the Second Circuit Court of Appeals has explained, "When a defendant commits repeated acts, each of which can independently support a cause of action, claim preclusion principles *will* require plaintiffs seeking relief as to all of the defendant's conduct to bring together the causes of action that have already arisen when the litigation commences, provided that such acts are based on the same connected series of transactions." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 501 (2d Cir. 2014) (emphasis original); *see also Index Fund, Inc. v. Hagopian*, 677 F. Supp. 710, 715 (S.D. N.Y. 1987). Thus, courts have recognized that claims may be part of the same cause of action where they are based on

---

bid to recover against the Contractors for the damage to the railroad tracks in the 2014 Tort Case.

alleged harm to different types of property suffered during the course of a defendant's activities on a contract project or in a similarly identifiable, discrete undertaking. *See J.Z.G. Resources, Inc. v. Shelby Ins. Co.*, 84 F.3d 211, 215 (6th Cir. 1996) (concluding that claims based on damage to roads and claims based on damage to other property, all allegedly caused by contractor's negligent construction work on subdivision project, "ar[o]se out of the same transaction"); *In re City of Detroit*, 531 B.R. 171, 174-75 (Bankr. E.D. Mich. 2015) (where prior action contested municipality's taking of two parcels of real property, *res judicata* barred subsequent claims alleging that municipality had also unlawfully taken two tractors located on the land); *Marshall Contractors, Inc. v. Integrated Gas Systems, Inc.*, 105 F.3d 653 (table), 1996 WL 762795, at *2 n. 5 (5th Cir. 1996) (claim that defendant converted plaintiff's property intended for use on a construction project for plaintiff was barred by *res judicata* based on prior suit in which plaintiff claimed defendant had breached their contract underlying the construction project); *see also Trustmark Ins. Co.*, 299 F.3d at 1270 (holding that *res judicata* prevented a plaintiff from bringing successive lawsuits for separate breaches of the same contract that were all alleged to have occurred prior to the filing of the first suit). Likewise, a series of similar or continuing trespasses against property rights may also be "'considered a unit up to the time when action

is brought,' " foreclosing claims for individual trespasses occurring during the period prior to the filing of the first suit. *TechnoMarine*, 758 F.3d at 501 (quoting Restatement (Second) of Judgments § 24 cmt. d (1982)).

Indeed, GIP's Amended Complaint goes so far as to plead significant common factual ground between the two cases. In particular, GIP has alleged that the Contractors' conversion of the railroad tracks occurred "*during the course of [the Contractors'] work in mining for 'kish'* " on the EPA Superfund project. (Amd. Compl. ¶ 37 (emphasis added)). GIP now backpedals from that allegation, characterizing it as but "one isolated clause" of its Amended Complaint (Doc. 48-1 at 1) that means no more than that the conversion of the railroad tracks "occurred while the Defendants were on-site." (*Id.* at 3). GIP has unambiguously pled, however, that the Contractors were at the Site specifically because they were hired to perform the work on the EPA's CERCLA response. (*See* Amd. Compl. ¶¶ 23-26, 29, 32). Even more specifically, GIP recognizes that the Contractors were tasked with conducting a large-scale removal of material from the slag piles as part of that CERCLA response, apparently because, at least according to the government, the slag piles were leaching hazardous substances into the environment. The removal of such material, of course, lies at the very heart of GIP's claims of conversion related to the kish and slag. And GIP's Amended

Complaint expressly alleges that it was "during the course" of that same mining operation on the Excluded Real Property that the Contractors removed the track from two of the spur rail lines and buried a section of another spur line with "non-saleable mined material" taken from the slag piles, all "with the EPA's knowledge and approval." (*See id.* ¶¶ 37-39).

GIP nonetheless insists that *res judicata* does not apply because its two types of claims are each based on "distinct and independently actionable harms" and rely on different "relevant facts and evidence" such that "the success or failure of one claim is not determinative of the other." (Doc. 45 at 10). In support, GIP relies heavily upon the Supreme Court's 1894 decision in *United States v. The Haytian Republic*, 154 U.S. 118. (*See* Doc. 45 at 8-12). There, the federal government had instigated civil asset forfeiture proceedings in a federal district court in the state of Washington against a ship, based upon instances of alleged smuggling of opium and Chinese nationals on certain enumerated dates. About a month later, while that suit was still pending, the government initiated a similar proceeding against the vessel in a federal district court in Oregon for additional instances of such alleged smuggling. The district court in Oregon, however, dismissed as subject to abatement all such smuggling charges to the extent they were alleged to have occurred prior to the filing of the Washington suit. That

ruling was affirmed on appeal by the Ninth Circuit.  On certiorari, however, the

Supreme Court reversed, holding that the rule against splitting one's cause of

action did not require the dismissal of the earlier charges.  In so doing, the Court

recognized that, in order for the prior pending suit to bar claims in the later one,

"there must be the same rights asserted and the same relief prayed for; the relief

must be founded upon the same facts, and the title, or essential basis, of the relief

sought must be the same.'"  154 U.S. at 124 (quoting *Watson v. Jones*, 80 U.S.

679, 715 (1871)).  In support, the court observed that, under related principles

applicable to establishing the defense of *res judicata*, "[o]ne of the tests laid down

for the purpose of determining whether or not the causes of action should have

been joined in one suit is whether the evidence necessary to prove one cause of

action would establish the other." *Id.* at 125.  Then applying that "same evidence"

test, the Court concluded that the various charges alleging enumerated instances of

smuggling represented distinct causes of action that the government could pursue

separately, reasoning as follows:

> It is evident that proof showing that a particular lot of opium
> had been smuggled on a particular day, or a particular number of
> Chinese had been imported at a particular time, would have no
> relevancy or tendency to prove the smuggling of a different lot of
> opium at a different time, or the importation of a different number of
> Chinese at a different date.

*Id.* According to GIP, "[t]here could be no more apt language illustrating that GIP's claims are in fact two discrete matters." (Doc. 45 at 12).

GIP's reliance on *The Haytian Republic* is misplaced. While that case applied a "same evidence" requirement for claims to be deemed part of the same cause of action, that "standard has been superseded ... by evolving precedents." *Sikorsky Aircraft Corp. v. United States*, 122 Fed. Cl. 711, 722 (2015). The Court of Federal Claims has explained:

> As the Supreme Court observed in 1983, 89 years after *Haytian Republic* was decided, "[d]efinitions of what constitutes 'the same cause of action' have not remained static over time." *Nevada v. United States*, 463 U.S. 110, 130 (1983) (comparing Restatement of Judgments § 61 (1942), with Restatement (Second) of Judgments § 24 (1982)).

> In *Nevada*, the Supreme Court explained the evolution of the criteria for application of claim preclusion by reference to the change in the Restatements:

>> Under the first Restatement of Judgments § 61 (1942), causes of action were to be deemed the same "if the evidence needed to sustain the second action would have sustained the first action." In the Restatement (Second) of Judgments (1982), a more pragmatic approach, one "not capable of a mathematically precise definition," was adopted. *Id.* § 24, comment b. Under this approach causes of actions are the same if they arise from the same "transaction;" whether they are products of the same "transaction" is to be determined by "giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they

form a convenient trial unit, and whether their treatment
as unit conforms to the parties' expectations or business
understanding or usage." *Id.* § 24.

*Nevada*, 463 U.S. at 130 n.12.

*Sikorsky Aircraft Corp.*, 122 Fed. Cl. at 722; *see also Tohono O'Odham Nation*,

563 U.S. at 316 ("The now-accepted test in preclusion law for determining

whether two suits involve the same claim or cause of action depends on factual

overlap, barring 'claims arising from the same transaction.'" (quoting *Kremer v.*

*Chemical Constr. Corp.*, 456 U.S. 461, 482, n. 22 (1982), and citing Restatement

(Second) of Judgments § 24 (1980)).  Further, as stated previously, it is clear that

the modern "transactional" approach governs the "same-cause-of-action" inquiry

in the Eleventh Circuit.  *See Baloco*, 767 F.3d at 1247; *Ragsdale*,193 F.3d at

1235,1239 & n. 8, 1240.  While evidentiary overlap between claims remains a

consideration under that approach, it is not itself determinative, and the

Restatement expressly acknowledges that claims may be deemed part of the same

transaction or a connected series of transactions in the absence of such an overlap.

*See Ragsdale*, 193 F.3d at 1239 n. 8; Restatement (Second) of Judgments § 24(2)

cmt. b (1980).  Given that the *The Haytian Republic* Court applied the

substantially narrower, outdated "same evidence" test, neither the analysis nor the

result in that case are controlling or even particularly instructive here, contrary to

GIP's assertion.

Based on the foregoing, the court concludes that GIP's claims against the Contractors alleging that they converted and negligently damaged GIP's spur line tracks and GIP's claims alleging that the Contractors converted and negligently damaged kip and slag arise out of the same transaction or a series of connected transactions. As a result, the final judgment in the 2014 Tort Case, resolving GIP's claims as to the railroad tracks, operates to bar GIP's present claims related to the kish and slag, under the doctrine of *res judicata*. The Contractors' motion to dismiss will thus be granted.

## B.

The court now turns to the United States' Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, based on sovereign immunity. Under that doctrine, the United States is immune from liability absent its consent. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). Further, the "'limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied.'" *Lehman v. Nakshian*, 453 U.S. 156, 161 (1981) (quoting *Soriano v. United States*, 352 U.S. 270, 276 (1957)). So absent a specific waiver, sovereign immunity bars a suit against the federal government for lack of subject-matter jurisdiction. *See FDIC v. Meyer*,

510 U.S. 471, 475-76 (1994).

GIP's claims at issue are brought pursuant to the FTCA, which authorizes suits against the United States for damages "caused by the negligent or wrongful act or omission of any employee of the Government ... under circumstances where ... a private person ... would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA also contains a limited waiver of sovereign immunity. *See Dalrymple v. United States*, 460 F.3d 1318, 1324 (11th Cir. 2006). Nevertheless, the United States argues that one of the exceptions to the FTCA's limited waiver applies here. Specifically, the United States relies on the "discretionary-function" exception, which provides that the United States may not be held liable based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "When the discretionary function exception to the FTCA applies, no federal subject matter jurisdiction exists." *U.S. Aviation Underwriters, Inc. v. United States*, 562 F.3d 1297, 1299 (11th Cir. 2009).

The discretionary-function exception is intended "to prevent judicial second-guessing of legislative and administrative decisions grounded in social,

economic, and political policy through the medium of an action in tort." *United*

*States v. Gaubert*, 499 U.S. 315, 323 (1991) (quoting *Varig Airlines*, 467 U.S. at

814). The Supreme Court has enunciated a two-part test for determining whether

the exception applies. If both prongs are met, the United States is shielded from

liability, even if its actions were negligent. *See id.* First, courts must determine

whether the conduct at issue "involv[es] an element of judgment or choice." *Id.* at

322. If so, courts then look at the second factor, which is "whether that judgment

is of the kind that the discretionary function exception was designed to shield."

*Gaubert*, 499 U.S. at 322-23 (quoting *United States v. Varig Airlines*, 467 U.S.

797, 813 (1984)). The United States argues that both prongs of the exception are

met because the conduct of which GIP complains arose, according to the United

States, in the context of decisionmaking by the EPA pursuant to its broad

discretionary authority under CERCLA to remove and remediate hazardous

substances at the Site.

## 1.

In response, GIP opens by arguing that the United States is collaterally

estopped from invoking the discretionary-function exception based on this court's

judgment in the CERCLA Case. Under the doctrine of collateral estoppel,

otherwise known as "issue preclusion," "once a court has decided an issue of fact

or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *San Remo Hotel, L.P. v. City & Cty. of San Francisco, Cal.*, 545 U.S. 323, 336 n. 16 (2005) (*quoting Allen v. McCurry*, 449 U.S. 90, 94 (1980)); *see also* Restatement (Second) of Judgments § 27 (1982). For issue preclusion to apply, whether under federal law or Alabama state law,[8] the issue at stake in the present action must be identical to one that was both actually litigated and necessary to the judgment in the prior suit. *See Baloco v. Drummond Co.*, 767 F.3d 1229, 1251 (11th Cir. 2014); *Manning v. City of Auburn*, 953 F.2d 1355, 1358 (11th Cir. 1992); *Dairyland Ins. Co. v. Jackson*, 566 So. 2d 723, 726 (Ala. 1990).

In support of its preclusion argument, GIP points to this court's holding in the CERCLA Case that the United States was not entitled under CERCLA § 107(a) to recover its costs incurred in cleaning up the Site from GIP. That ruling, according to GIP, amounts to a judicial determination that "the Government was

---

[8]GIP contends, without citation to authority, that "collateral estoppel is a substantive issue and hence is governed by Alabama state law." (Doc. 46 at 8). The court notes, however, that there is a binding Fifth Circuit decision holding that "under the Federal Tort Claims Act a federal court should apply federal principles of res judicata and collateral estoppel in considering the preclusive effect of a prior federal judgment." *Johnson v. United States*, 576 F.2d 606, 612 (5th Cir. 1978); *see also Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (decisions of the former Fifth Circuit handed down before October 1, 1981 are binding in the Eleventh Circuit). Even so, the court need not consider further whether state or federal law governs because any potential differences between them are immaterial here. *See McCulley v. Bank of Am., N.A.*, 605 F. App'x 875, 878 (11th Cir. 2015).

without any lawful discretion to have stuck GIP with the bill for the remediation."

(Doc. 46 at 1 (footnote omitted)). "Even if there were some genuine

environmental hazard to be addressed," GIP says, "the EPA had zero lawful basis

to force GIP to pay for it." (*Id.* at 8). GIP argues, therefore, that the United States

is collaterally estopped from now claiming that the EPA had "discretion ... to

liquidate GIP's assets and keep the money" to fund CERCLA cleanup efforts at

the Site. (*Id.* at 6). The court disagrees.

Issue preclusion does not apply because the CERCLA Case did not involve

the identical issue presented here. In the former action, the United States sued GIP

under CERCLA § 107(a), demanding that GIP be made to reimburse the United

States for costs the EPA incurred to clean up the Site. This court rejected the

government's claim based on a determination that GIP did not qualify as an

"owner" or "operator" of a "facility" or otherwise as a PRP upon whom CERCLA

§ 107(a) fastens liability for response costs. GIP is simply wrong to say, however,

that this "Court has already found ... that CERCLA flat-out did not authorize the

[EPA's] conduct here at all" or that such conduct gave rise to an "outright

violation of CERCLA." (Doc. 54 at 3). That is, whether GIP might be a PRP

liable to reimburse the United States for its response costs is, quite clearly and on

its face, distinct from the issue here: whether the United States is liable in tort to

38

pay damages for loss or damage to GIP's property caused by the EPA's cleanup activities ostensibly undertaken pursuant to its authority under CERCLA.

GIP repeatedly asserts that the resolution of the CERCLA Case is inextricably linked to its FTCA claims by focusing on the Complaint's allegations that the Contractors, acting on behalf of the EPA, *sold* GIP's property on the Excluded Real Property and that a portion of the sale proceeds were credited to *offset* the EPA's cleanup costs. GIP insists that such is tantamount to having "stuck GIP with the bill to fund the clean-up." (Doc. 46 at 1). GIP thus seems to posit that a ruling in this case that fails to hold the United States liable under the FTCA is equivalent to holding GIP liable for response costs under § 107(a). That is simply a non-sequitur. The question here is whether the activities occurring at the Site during the clean-up deprived GIP of its right to use and enjoy its property so as to expose the United States to tort liability. Contrary to GIP's suggestion, however, what exactly was ultimately *done* with GIP's property *after* any such a deprivation occurred is not the issue. "*Any* use or disposition of the personal property of another is a conversion where it is unauthorized by, without the license or consent of, or in violation of the orders or instructions of the owner and is in denial or defiance of the owner's rights." 90 C.J.S. Trover and Conversion § 32 (emphasis added). GIP offers no authority or coherent argument for why the

government's FTCA tort liability or immunity *vis-á-vis* the alleged appropriation of GIP's property might at all turn upon whether that property was sold to third parties as opposed to, say, being buried in a landfill or capped with concrete.

In sum, while the court did hold in the CERCLA Case that GIP's ownership of the slag piles did not itself authorize the imposition of liability upon GIP for the EPA's response costs under § 107(a), the court did not purport to determine, expressly or impliedly, that any action performed by or on behalf of the EPA at the Site was, in fact, *unauthorized* under CERCLA. As such, the issues in the two cases are not identical and collateral estoppel does not preclude the United States from invoking the discretionary-function exception.[9] *Cf. Shapiro v. Alexanderson*, 741 F. Supp. 472, 476 (S.D.N.Y. 1990) (prior state court judgment based on finding that contract by which owners sold land to County was unenforceable and could not serve as basis for holding the County liable in tort for damage to the site based on County's operation of a landfill there was not identical to a finding that the County cannot be held liable for response costs under CERCLA § 107(a)).

_____

[9]The United States has also argued that it cannot be collaterally estopped from relying upon the discretionary-function exception due to its jurisdictional nature, on the principle that federal subject-matter jurisdiction cannot be created by estoppel. *See generally Autrey v. United States*, 889 F.3d 973, 989 (11th Cir. 1989) ("It is too late in the day to argue that estoppel may confer jurisdiction on a court of limited jurisdiction, be those limitations based on constitutional or statutory grounds."). However, the court need not further address that argument given the court's conclusion that the substantive requirements of issue preclusion are not met here.

With that, the court turns to consider the applicability of the discretionary-function

exception on the merits.

**2.**

The Eleventh Circuit has outlined the analysis for determining whether the

discretionary-function exception applies as follows:

> This exception "marks the boundary between Congress' willingness
> to impose tort liability upon the United States and its desire to protect
> certain governmental activities from exposure to suit by private
> individuals." *United States v. Varig Airlines*, 467 U.S. 797, 808
> (1984). This exception must be strictly construed in favor of the
> Government, and if it applies, federal courts lack subject-matter
> jurisdiction over the claims. *See U.S. Aviation Underwriters, Inc. v.
> United States*, 562 F.3d 1297, 1299 (11th Cir. 2009); *JBP
> Acquisitions*[, *LP v. United States ex rel. FDIC*, 224 F.3d 1260, 1263
> (11th Cir. 2000)].
>
> In evaluating whether the discretionary-function exception
> applies, we first "must determine exactly what conduct is at issue."
> *Autery v. United States*, 992 F.2d 1523, 1527 (11th Cir. 1993).
> Courts then apply the two-step test developed by the Supreme Court
> in *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531 (1988),
> and *United States v. Gaubert*, 499 U.S. 315 (1991). *See U.S. Aviation
> Underwriters*, 562 F.3d at 1299.
>
> First, we consider whether the challenged conduct "is a matter
> of choice for the acting employee." *Berkovitz*, 486 U.S. at 536.
> "[C]onduct cannot be discretionary unless it involves an element of
> judgment or choice." *Id.* Challenged conduct is not discretionary
> "when a federal statute, regulation, or policy specifically prescribes a
> course of action for an employee to follow" because "the employee
> has no rightful option but to adhere to the directive." *Id.* at 536.

* * *

　　　If the conduct involves an element of judgment and is discretionary, the court "must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* at 536. As the Supreme Court has explained, the exception is designed to prevent "judicial second guessing" of decisions "grounded in social, economic, and political policy." *Id.* at 536-37 (quoting *Varig Airlines*, 467 U.S. at 814). Accordingly, the discretionary-function exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 537; *see also Gaubert*, 499 U.S. at 323.

　　　In *Gaubert*, the Supreme Court further elaborated on the discretionary-function exception by linking the two parts of the test with a presumption: "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." 499 U.S. at 324.

*Swafford v. United States*, 839 F.3d 1365, 1370-71 (11th Cir. 2016).

Both sides agree that the United States' motion, which relies upon evidence beyond the Complaint, namely, Byrd's affidavit, makes a factual challenge to subject-matter jurisdiction. (*See* Doc. 37-1 at 6; Doc. 46 at 5). The Eleventh Circuit has recognized that, in the face of such an attack, the burden is on the plaintiff to prove that jurisdiction exists. *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002). Thus, GIP ultimately bears the burden to show that the discretionary-function exception does not apply to the government's alleged conduct. *Id.* Further, at the pleading stage, an FTCA plaintiff must allege a

plausible claim that falls outside the discretionary function exception. *Douglas v. United States*, 814 F.3d 1268, 1276 (11th Cir. 2016).

The alleged actions of which GIP complains in this case can be broadly identified as those taken whereby the EPA, either itself or through its contractors or agents did the following: (1) prohibited GIP from entering the Excluded Real Property, thereby preventing GIP from using, removing, or otherwise enjoying its personal property located there, namely, the kish, slag, and spur line tracks ; (2) mined and removed kish and slag, yielding recycled metal materials that were then sold to third parties, with the profits being used in part to offset the EPA's costs of cleaning up at the Site; (3) removed approximately 1,400 feet of track on the HS-1 and HS-2 spur lines GIP says it owned, with the associated materials being destroyed, sold to third parties, or otherwise disposed of; and (4) buried about another 1,000 feet of track on the HN-1 spur line GIP claims to have owned, rendering it unusable.

The United States maintains that all such alleged actions are protected under the discretionary-function exception because they would have been undertaken pursuant to the EPA's broad discretionary authority under CERCLA to clean up facilities containing hazardous substances.  In support, the government points to CERCLA § 104(a), which provides in relevant part that,

> [w]henever ... any hazardous substance is released or there is a
> substantial threat of such a release into the environment, ... the [EPA,
> as the president's designee], is authorized to ... remove or arrange for
> the removal of, and provide for remedial action relating to such
> hazardous substance ... at any time ... or take any other response
> measure ... which the [EPA] deems necessary to protect the public
> health or welfare or the environment.

42 U.S.C. § 9604(a).  The government further emphasizes that provisions in

CERCLA §§ 121(a) and (b) vest the EPA with broad discretion to "select

appropriate remedial actions," § 121(a), 42 U.S.C. § 9621(a), that are "protective

of human health and the environment, ... [and] cost effective," in light of certain

enumerated considerations. § 121(b), 42 U.S.C. § 9621(b).  Based upon the broad

nature of the government's clean-up authority under CERCLA, many courts have

applied the discretionary-function exception to bar FTCA claims brought by

plaintiffs complaining of personal injuries and/or property damage flowing from

the government's response activities.  *See, e.g., U.S. Fidelity & Guar. Co. v.*

*United States*, 837 F.2d 116, 122-23 (3d Cir. 1988); *Daigle v. Shell Oil Co.*, 972

F.2d 1527, 1541-43 (10th Cir. 1992); *United States v. Amtreco, Inc.*, 790 F. Supp.

1576, 1581 (M.D. Ga. 1992); *United States v. JG-24, Inc.*, 309 F. Supp. 2d 230,

233-34 (D.P.R. 2004); *United States v. Green*, 33 F. Supp. 2d 203, 221-23

(W.D.N.Y. 1998); *United States v. Skipper*, 781 F. Supp. 1106, 1114-15 (E.D.N.C.

1991); *see also Employers Ins. of Wausau v. United States*, 27 F.3d 245, 248 (7th

Cir. 1994) (discretionary-function immunity barred FTCA suit alleging that the EPA wrongfully issued administrative orders under CERCLA directing the plaintiff to perform a cleanup).

Indeed, as the United States highlights, in the 2014 Tort Action, this court, speaking through Chief Judge Bowdre, concluded that the discretionary-function exception would apply to FTCA claims against the United States under the circumstances of this case, at least to the extent such claims were based on the EPA's decision to perform a cleanup at the Site through removal and mining operations in the slag piles. *See Gadsden Indust. Park*, 111 F. Supp. 3d at 1229. Specifically, Judge Bowdre did so in response to an assertion by the Contractors that GIP's state-law claims for conversion and negligence based on the removal and burial of the spur line tracks were preempted under the government-contractor defense of *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). *See* 111 F. Supp. 3d at 1228-29. To establish that defense, Judge Bowdre recognized that the Contractors had to show (1) that the government actor, in this case the EPA, possessed a "unique federal interest" (2) that is in "significant conflict" with state tort law, and (3) that the contractors' actions were within the "scope of displacement" because they were effectively required or otherwise specified by the EPA. *Id.* at 1228. After finding that the EPA's remediation of the Site under

45

CERCLA involved a qualifying federal interest, Judge Bowdre recognized that whether that interest was in "significant conflict" with Alabama tort law effectively turned upon the applicability of the discretionary-function exception to FTCA liability. *Id.* at 1228-29. And to that end, after acknowledging the discretionary-function exception's two-prong test, she concluded that the exception would apply, reasoning as follows:

> EPA's decisions regarding how to remediate property are discretionary because they are based on considerations of public policy. In *Amtreco*, the Middle District of Georgia found that Amtreco's claims against the United States for conversion and property damage were barred by the discretionary function exception to the FTCA because "[c]ourts have consistently held that EPA decisions on how to conduct a cleanup operation are shielded by the discretionary function exception." *Amtreco, Inc.*, 790 F.Supp. at 1581; *see U.S. Fidelity & Guaranty Co. v. United States*, 837 F.2d 116, 122 (3rd Cir. 1988); *see Richland-Lexington Airport Dist.* [*v. Atlas Props., Inc.*, 854 F. Supp. 400, 423 (D.S.C. 1994)]; *see United States v. Skipper*, 781 F. Supp. 1106, 1114 (E.D.N.C. 1991); *see United States v. Colbert*, 1991 WL 183376, at *3 (S.D.N.Y. Sept. 11, 1991) ("[C]laims arising out of the conduct of government employees in carrying out an EPA response action ... fall within the discretionary function exception of [the FTCA]."); *see United States v. Nicolet, Inc.*, 1987 WL 8199, at *5-6 (E.D. Pa. Mar. 19, 1987) ("That formulation [to carry out a remediation] did involve policy determinations and it is, therefore, shielded by the discretionary function exception.").

> No statute, regulation or policy mandated a particular course of action by EPA. *See* 42 U.S.C. § 9621 ("The President shall select appropriate remedial actions determined to be necessary."). Instead, EPA chose between different remediation options to reduce elevated

> pH levels in water sources surrounding the eastern excluded property. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991).
>
> EPA employed CMC (who subsequently employed Harsco) to reduce the volume in the slag piles and recontour the slag piles to flow into the lagoons on the eastern excluded property. EPA chose this course of action in an attempt to balance the effectiveness, speed, and cost of the remediation. EPA exercised its discretion and made a decision to employ CMC and Harsco to mine the slag piles based on considerations of public policy.
>
> Thus, EPA's unique federal interest in remediation of the eastern excluded property and state tort liability are in significant conflict and state tort law must be displaced as to actions directed by EPA.

*Gadsden Indust. Park*, 111 F. Supp. 3d at 1229. Nevertheless, Judge Bowdre went

on to hold that the Contractors were not entitled to summary judgment based on

the government-contractor defense. *Id.* at 1230-31. That was so, she concluded,

because, viewed in the light most favorable to GIP, the evidence supported that the

Contractors had removed, buried, and sold the spur lines "on their own initiative"

and "not ... at the direction of EPA." *Id.* at 1230. As a result, the record failed to

establish as a matter of law that those actions by the Contractors fell within the

scope of state law displaced by the EPA's federal interest in conducting an

environmental cleanup at the Site. *Id.*

The United States argues that Judge Bowdre's analysis of the precedents and principles regarding the discretionary-function exception in the 2014 Tort Case is sound and counsels that this court likewise conclude that the exception applies to deprive the court of jurisdiction over GIP's FTCA claims. In response, GIP takes several different tacks. First, GIP emphasizes that no federal entity was a party to the 2014 Tort Case, so, GIP says, "the matters under consideration by Judge Bowdre were wholly distinct from the issues instantly *sub judice*." (Doc. 54 at 4). It is true that no government defendant or FTCA claim was in the case at that point. Therefore, Judge Bowdre was not called upon to determine whether the discretionary-function exception itself actually precluded any claim. Rather, she analyzed the exception only as a *proxy* for determining the existence *vel non* of one of the elements of the government-contractor defense: whether there was a significant conflict between the EPA's federal interest and Alabama state tort law.

That being said, GIP's bald assertion argument that "the matters" Judge Bowdre considered in the 2014 Tort Case were "wholly distinct" from those at issue here is too facile. Judge Bowdre expressly analyzed the requirements of the discretionary-function exception as they relate to claims by GIP that were based, at least in part, on the same allegations and circumstances that underlie GIP's claims in this action. Indeed, the undersigned finds Judge Bowdre's analysis to be wholly

persuasive insofar as it suggests that the discretionary-function exception applies here, at least to the extent that GIP's FTCA claims are founded upon allegations that it suffered property loss or damage as a consequence of the EPA's exercise of its broad discretionary authority under CERCLA to determine appropriate procedures, means, and methods to address a release or threatened release of hazardous substances on the Excluded Real Property. Accordingly, the court will so hold.

That leads to GIP's second argument. In it GIP contends that, even if the discretionary-function exception applies to claims asserting that the EPA "negligently selected one remediation plan over another, and in so utilizing its discretion harmed [the plaintiff's] property" (Doc. 54 at 3), GIP resists any such characterization of its claims. Rather, GIP maintains that the discretionary-function exception does not apply because the crux of its FTCA theory is "that CERCLA flat-out did not authorize the [United States'] conduct here at all" (*id.*), thereby rendering that conduct non-discretionary. In support, GIP asserts in its brief that, by acting "to remove, liquidate, and keep the profits of selling GIP's property" (Doc. 46 at 11), the United States engaged in "knowing theft ... for purely profiteering motive" and was pursuing "no valid lawful purpose." (*Id.* at 9). Such conversion of "GIP's assets to [the government's] own uses," GIP

maintains, "far  exceeds any powers and authority granted to it under CERCLA."
(*Id.* at 11).

As a general matter, conduct that lies clearly outside the legal authority
delegated to a federal agency or employee is by its nature non-discretionary and
will not allow the United States to claim immunity under the discretionary-
function exception.  *See Hatahley v. United States*, 351 U.S. 173 (1956)
(discretionary-function exception did not apply to actions of Federal range agents
who appropriated, sold, or destroyed the plaintiffs' horses that were grazing on
federal land, where agents failed to comply with prior written notice requirement
imposed by Federal Range Code); *Simons v. United States*, 413 F.2d 531, 534 (5th
Cir. 1969) (exception did not apply if the government committed a trespass on
land over which it had not authority or discretion); *Birnbaum v. United States*, 588
F.2d 319, 329 (2d Cir. 1978).  Under that principle, the court would acknowledge
that, even where the EPA's response authority has been triggered under CERCLA
§ 104(a), the discretion conferred *to remediate the environmental hazard* cannot
stretch so far as to give the government *cart blanche* to damage, destroy, or
confiscate and sell any private property it might encounter at the site, no matter
how tenuous the relationship between that property, the conduct causing the loss,
and the objective of remediating the land.

To create a more stark example, one might suppose that GIP owned a fully functional dump truck and had left it on the Excluded Real Property when it was sealed off by the EPA to begin remediation work. In our hypothetical, GIP's truck did not itself contain any hazardous substance being released or threatening to be, and the truck was parked a substantial distance from the location of the hazardous substance(s) that did prompt the cleanup. Thus, the truck clearly was in no way obstructing or impeding the remediation. Under that scenario, if someone at the site performing cleanup work on behalf of the EPA happened upon GIP's truck and negligently drove a motor vehicle into it, that act would not be covered by the discretionary-function exception. *See Gaubert*, 499 U.S. at 325 n. 7. Likewise, the court is willing to assume that, in the absence of a plausible claim of some material relationship between the truck and the EPA's objective of remediating the environmental hazard posed by hazardous substances on the land, the EPA would not be acting within the scope of its discretionary authority under CERCLA if the EPA, motivated by its recognition of the value and utility of the truck, simply appropriated it for the government's own purpose, as through a seizure and sale or keeping and using it on the project.

The problem for GIP, however, is that it has not sufficiently pled such a claim that falls outside the discretionary-function exception. *See Douglas*, 814

F.3d at 1276. Generally speaking, there is a presumption that the EPA's actions, like those of other federal agencies and public officials, are regular, in accordance with the law, and otherwise valid. *See In re Golden Mane Acquisitions, Inc.*, 243 B.R. 773, 788 n. 8 (Bankr. N.D. Ala. 1999), and the authorities cited therein. GIP's Complaint generally admits that the activities of the EPA and the Contractors at the Site were at least "purportedly" undertaken pursuant the EPA's cleanup authority under CERCLA. (Compl. ¶¶ 23, 24). GIP does allege, "upon information and belief," that "no condition existed at the Site which would have authorized, necessitated or required the Defendants under CERCLA to have removed [GIP]'s property, ... to have covered or discarded [GIP's] property and/or to have conveyed it to third parties." (*Id.* ¶ 42). GIP also makes a number of allegations to the effect that Defendants' actions "unlawfully interfered" with GIP's property rights (*Id.* ¶ 32), "constitute a conversion" (*id.* ¶¶ 45, 52), were "negligent," and beyond the Defendants' "discretion." (*Id.* ¶¶ 48, 56). As explained below, however, such allegations are insufficient from which to reasonably infer that the challenged actions were not taken pursuant to, and within the scope of, the EPA's discretionary authority under CERCLA.

For starters, such recitals amount to mere labels and legal conclusions that are not due to be credited at the pleading stage. *See Iqbal*, 556 U.S. at 678-679.

The EPA's authority under CERCLA arises "whenever ... any hazardous substance is released or there is a substantial threat of such release into the environment." CERCLA § 104(a)(1)(A), 42 U.S.C. § 9604(a)(1)(A).  Conspicuously absent from GIP's Complaint, however, is any allegation that there was not, in fact, such a release or threatened release at the Site.  As such, GIP's pleading fails to impugn EPA's authority under CERCLA to have performed remediation work generally. And if the EPA possessed such authority, the statutory scheme afforded it broad discretion when it came to choosing how to go about performing the associated work.  *See* CERCLA §§ 121(a) & (b), 42 U.S.C. §§ 9621(a) & (b).  In that vein, GIP not identified any specific, mandatory provision of CERCLA that was supposedly violated.

Moreover, unlike with the "dump truck" hypotheticals discussed above, GIP's Complaint does not contain facts and circumstances sufficient to indicate that GIP's claimed loss and damage to property did not, in fact, occur in the course of EPA's CERCLA remediation or as a legitimate incident thereto.  Again, there is a presumption that the EPA's official actions were regular and in accordance with the law.  Nor are the actions of which GIP complains of such a character on their face that one might infer that they were not part of the EPA's cleanup efforts.  GIP complains that the EPA is liable based on the removal of kish and recycled metals

53

from the slag piles on the Excluded Real Property. However, GIP has never specifically disputed, either in the Complaint or in its briefs, the government's assertion, supported by Byrd's affidavit, that it was the slag piles that contained the hazardous substances leaching into the environment, thereby precipitating the EPA's cleanup. Accordingly, one cannot reasonably infer that operations by which the volume of material in the slag piles was reduced were unrelated to remediation activities so as to fall outside the EPA's discretionary authority under CERCLA.

GIP emphasizes, however, that the Contractors not only removed the kish, they also sold it and allocated a percentage of the proceeds to defray the EPA's costs of response. But as explained previously, when it comes to liability for conversion, the question of what happened to GIP's property after Defendants took it away is a red herring; liability would be the same irrespective of whether the EPA, in its discretion, decided that GIP's property that was removed or disturbed in the course of the cleanup should ultimately be sold, buried, or destroyed. The court concludes that the discretionary-function exception applies to GIP's FTCA claims based on the removal and sale of the kish and slag. *Cf. United States v. Articles of Drug*, 825 F.2d 1238, 1248-49 (8th Cir. 1987) (FTCA claim based on Food and Drug Administration's seizure of pharmaceutical

company's drug products on the basis that they were "misbranded" in violation of federal law was subject to the discretionary-function exception); *Terrell v. Hawk*, 154 F. App'x 280, 282-83 (3d Cir. 2005) (discretionary-function exception applied to FTCA claim against prison officials, seeking damages for alleged confiscation of his art supplies, where Bureau of Prisons regulation made decisions regarding removal and disposal of unidentified art and hobby craft items discretionary in nature); *Cabalce v. VSE Corp.*, 914 F. Supp. 2d 1145, 1163 (D. Haw. 2012) (decision of federal officials to store seized fireworks, rather than destroy them immediately, was covered by the discretionary-function exception).

GIP also claims that the United States is liable for the removal, destruction, sale, and/or burial of sections of spur line track on the Excluded Real Property. But again, GIP has not alleged sufficient factual matter from which one might reasonable infer that such actions were not undertaken as part of the CERCLA cleanup. To the contrary, as discussed in connection with the Contractors' motion to dismiss, GIP affirmatively alleges that the removal of tracks occurred "during the course of [the Contractors] mining for kish" (Compl. ¶ 37) and that burial of other tracks occurred when they were "covered with non-saleable mined material." (*Id.* ¶ 39). The court thus concludes that the discretionary-function also applies to

GIP's FTCA claims related to these claims.[10]

GIP maintains in its final argument, however, that it would be improper for the court to dismiss its FTCA claims based on the discretionary-function exception without first affording an opportunity to conduct jurisdictional discovery. The court disagrees. First, as explained above, GIP's allegations are insufficient to state a claim that falls outside the scope of the discretionary-function exception. A plaintiff must first plead a viable claim before obtaining jurisdictional discovery. *Culverhouse v. Paulson & Co. Inc.*, 813 F.3d 991, 994 (11th Cir. 2016). And second, even assuming *arguendo* that GIP has stated a cognizable claim, it would still be incumbent upon GIP to articulate with reasonable specificity what facts it expects would be revealed and how they would demonstrate the existence of jurisdiction. *See Instabrook Corp. v. InstantPublisher.com*, 469 F. Supp. 2d 1120, 1127 (M.D. Fla. 2006) (rejecting plaintiff's request for jurisdictional discovery where plaintiff "only generally requested such discovery, without explaining how such discovery would bolster its contentions"). GIP has not done so. Indeed, that is despite that GIP appears to have already conducted ample discovery as it relates

---

[10]The court would note that, even if it were assumed that the discretionary-function did not apply to GIP's FTCA claims regarding the spur line tracks, it would appear that those claims, like GIP's related Fifth Amendment claims it asserted against the United States in the 2013 Claims Case, have become subject to a collateral estoppel defense arising from this court's judgment in the 2014 Tort Case.

to the events and circumstances underlying this action in the 2010 Claims Case,

the 2013 Claims Case, and the 2014 Tort Case.

## IV.

Based on the foregoing, the Contractors' joint motion to dismiss (doc. 36)

and the United States' motion to dismiss (doc. 37) are both due to be **GRANTED**.

As a result, GIP's claims against the Contractors are due to be **DISMISSED**

**WITH PREJUDICE**, while GIP's claims against the United States are due to be

**DISMISSED WITHOUT PREJUDICE**, for lack of jurisdiction.  A separate

Final Order will be entered.

**DONE**, this the 3rd day of October, 2017.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge